## UNITED STATES FIDELITY & GUARANTY CO. v. METROPOLITAN NAT. BANK.
### No. 1457.

District Court, D. Minnesota, Fourth Division.
Sept. 19, 1932.

Cobb, Hoke, Benson, Krause & Faegre, of Minneapolis, Minn., for plaintiff.

Junell, Oakley, Driscoll & Fletcher, Ueland & Ueland, and Timerman & Vennum, all of Minneapolis, Minn., for defendant.

NORDBYE, District Judge.

The trial of this action was begun on April 19, 1932, and the taking of testimony was concluded on May 5, 1932. The matter was originally on the calendar as a jury case, and before trial was referred to an auditor by an order of this court wherein the auditor was "to make a preliminary investigation as to the facts, to hear the witnesses, report on the issues and matters hereinafter specified, and make and file a report in the office of the Clerk of this Court with a view to simplifying the issues for the jury, but not finally to determine any of the issues in the action." Thereafter the auditor duly submitted his report, but before trial a stipulation was entered into by and between the parties wherein a jury was waived and trial was had before the court. Such portions of the auditor's report and findings as may be inconsistent with, or contrary to, the findings and conclusions stated herein, are rejected by this court.

Plaintiff was surety on Hanke's official bond, and as surety made good to Hennepin county a shortage in Hanke's official depository accounts as county treasurer in the sum of $249,245.93. This action is brought by the plaintiff, claiming, as such surety, subrogation to the rights of the county, and also as assignee of Hennepin county. The county assigned to plaintiff all demands, claims, and debts which the county and state had against Hanke and others arising out of fraudulent, illegal, and improper acts on the part of Hanke, specifically including the claim against this defendant. It is contended that, while treasurer of Hennepin county, Hanke maintained a certain bank account with the defendant known as the "Over Remittance Account," and that, with notice and knowledge of the defendant, the said Hanke, between April, 1911, and August, 1922, withdrew from said bank account certain funds belonging to Hennepin county, and misappropriated and embezzled such funds. A rather extended statement of facts is required in order to present the situation that existed.

Henry C. Hanke was elected treasurer of Hennepin county in 1906, and continued as county treasurer by successive elections until August, 1922. Section 840 of the Minnesota Statutes requires the county treasurers in counties of over 150,000 inhabitants to give a bond in the sum of $250,000, conditioned upon the keeping and paying over according to law of all moneys he receives as such county treasurer. A bond in this sum was furnished by the plaintiff. The following Minnesota statutes should be noted:

Section 842 provides that "the county treasurer shall keep a full and accurate account of all moneys by him received, showing the amount thereof, the time when, by whom, and on what account paid."

Section 843 requires the county treasurer to receive "all moneys directed by law to be paid to him as such treasurer, and pay them out only on the order of the proper authority. All moneys belonging to the county shall be paid out upon the order of the county board, signed by the chairman thereof, and attested by the county auditor, or upon the warrant of the county auditor upon the presentation to him of the proper certificate of the person or tribunal allowing the same, and not otherwise."

Section 844 provides that "the chairman of the county board, the county auditor and clerk of the district court in each county shall constitute a board of auditors; * — * and it shall be the duty of such board to carefully examine and audit the accounts, books, and vouchers of the county treasurer, and count and ascertain the kind, description, and amount of funds in the treasury of such county, or belonging thereto, at least three times in each year, without previous notice to the treasurer."

Section 846 provides that "all county funds, as soon as received, shall be deposited by the county treasurer in the name of the county in one or more banks designated by the board of auditors, who, before designating such depository, shall advertise in one or more newspapers published in its county, or if, in its opinion, the public interests require, in other counties, for at least two weeks for proposals. Such proposals shall state what security will be given to said county for the funds so deposited, and what interest allowed on monthly balances. * * * "

Section 851 provides that "no county treasurer shall deposit any public funds in his individual name, or in any other capacity than as treasurer, under the penalty of five hundred dollars for each deposit so made."

Section 852 provides that "public funds shall at all times be kept separate from any private funds of the treasurer or any private person. * * * "

Section 853 requires county depositories to furnish the county auditor with a true and itemized statement of the treasurer's ac-

count and interest accrued on the first day of each month.

Section 2075 provides that "the county treasurer shall be the receiver and collector of all the taxes extended upon the tax lists of the county, whether levied for state, county, city, town, school, poor, bridge, road, or other purposes, and also of all fines, forfeitures, or penalties received by any person or officer for the use of the county. He shall proceed to collect the same according to law, and place the same when collected to the credit of the proper funds."

The county maintained official depository accounts with several of the banks in the city of Minneapolis, and, since 1913, the defendant bank was one of the official depositories of county funds. Henry C. Hanke also kept his personal account with the defendant bank. Consequently, there were three bank accounts maintained with the defendant with which Hanke was concerned—an official county account, his personal account, and the over-remittance account. The bulk of the county's money, however, was kept in three large depositories, known as the First National Bank, Northwestern National Bank, and Midland National Bank, all of Minneapolis. These banks will from time to time be referred to as the three large depositories.

Shortly after Hanke became county treasurer, he opened an account with the Germania Bank of Minneapolis, which he designated, according to the ledger of that bank, as "H. C. Hanke, Special." About a year later, the account was changed on the records to "H. C. Hanke, Over Remittance Account." On September 19, 1910, the account was again changed to "H. C. Hanke, Special." The Germania Bank on April 17, 1911, was taken over by the defendant, and a balance of $250.34 was in the H. C. Hanke special account at this time. This amount was checked out of the Germania Bank to the defendant bank on April 19, 1911. Since 1907 Hanke had used for the purpose of drawing out funds of the H. C. Hanke special account and H. C. Hanke Overremittance account, a check styled "Hennepin County Over Remittance Account." This check bore a place for two signatures—county treasurer and deputy—and a large picture of the Hennepin county courthouse was depicted on the left-hand side of the check. It was this form and style of check that was used by Hanke on April 19, 1911, to transfer the balance of the funds in the Germania Bank to the defendant bank, though, apparently, at that time the account in the Germania ledger was noted as "H. C.

Hanke, Special." On April 20, 1911, the account on the ledger of defendant bank appeared as "Over Remittance Account of Hennepin County." Later, in 1917, the account was carried as "Over Remittance Account, c/o H. C. Hanke, Co. Treas.," and this style continued until 1922. The signature cards were carried as "Over Remittance Acct., Henry C. Hanke, Co. Treas.,—Over Remittance Acct., Henn. Co., H. C. Hanke, Co. Treas.,— and Over Remittance Account, Henn. Co., Henry C. Hanke, Co. Treas." Defendant admits that there was an account carried with the defendant known as "Hennepin County Over Remittance Account." Various deputies in the county treasurer's office were authorized by Hanke to sign checks on this account during its entire existence. In fact, a majority of the checks drawn during the period in question were signed by deputies employed in the county treasurer's office. The form of the check used on this account, after the defendant bank took over the Germania Bank, was maintained substantially the same as the form used when the funds were transferred. It is significant that, except for a period in 1917 and 1918, the overremittance account checks bore no warrant number. The checks for the official depositories referred to the number of the warrant which was issued by the county auditor in authorizing disbursement of county funds. The overremittance account was not an official depository while it was maintained at the Germania Bank, nor was it an official depository during the entire period the account was maintained at the defendant bank. It is quite evident that the statutory limitations surrounding the handling of county funds prompted Hanke to provide for an account where moneys received by him by virtue of being county treasurer, but not belonging to the county, could be deposited without being mingled with county funds. The classes of funds that were deposited in this account clearly explain the reason for its existence.

It appears that many of the large real estate firms in the city of Minneapolis were desirous of protecting their equities in real estate from the penalties following the failure to pay the taxes thereon. Lists of property sold under contract for deed or mortgage deed, and other conveyances where the grantee or mortgagor agreed to pay the taxes, were furnished to the county treasurer by various real estate concerns with a check for sufficient money to pay the taxes thereon. This list and the check were delivered to the

county. treasurer before the taxes were in default. Instructions were given to the county treasurer that, if taxes were not paid on the properties designated, the real estate firm should be informed, and due authorization would be given to the county treasurer in writing authorizing him to draw on the fund so deposited, the various tax payments that the real estate concern desired to pay. In this manner the penalty was avoided, and if, perchance, a certain real estate firm made a deposit to cover this contingency, and later developments indicated that the entire taxes assessed on the property listed had been paid, then the entire deposit would be refunded to the depositor. This practice became quite general during the regime of Hanke as county treasurer, and many real estate firms availed themselves of the courtesy which he extended. The deposits so made consisted of funds that did not belong to Hennepin county. Hanke, under the law, had no authority to deposit such funds in the official depositories, and, in the event he did so, and it became necessary to restore to the depositor all or a portion of such funds, difficulties would arise on account of the statute of the state of Minnesota, which presumptively, at least, makes all excess funds in any official county depository moneys of the county. The funds so deposited with Hanke did not, of course, belong to him, but were held in trust by him for the parties making the deposit. Possibly the bulk of the funds so deposited would subsequently be returned to the depositor after the tax statements had been checked. It is clear that the system necessitated some kind of a special account, and Hanke made the practice of depositing such funds in the overremittance account. The total receipts from real estate deposits in this account from April 17, 1911, to August 18, 1922, amounted to $372,782.54.

Often taxpayers would inadvertently overpay their taxes. Many remittances came from distant points, and the remitter, not knowing the exact amount of the taxes, and in order to avoid a penalty, made a payment in round figures, resulting in an overpayment by a few dollars. In a county the size of Hennepin, such excess payments amounted to an appreciable sum each year. Such excess payments did not belong to Hennepin county, and apparently Hanke understood that, in order to restore such excess remittances to the owners, some special account must receive the fund. Consequently, he made the practice of depositing all excess tax payments in the overremittance account. When more convenient, a portion of all such excess payments would at times be deposited in the overremittance account by an official check of the county treasurer instead of cash, and the excess cash deposited in the official depository. During the period in question, these excess tax payments which were deposited in the overremittance account amounted to $105,987.08.

There is no provision in the law of the state of Minnesota for partial payment of taxes, except that one-half may be paid on or before May 31st, and the second half on or before October 31st of each year. A practice grew up in Hennepin county while Hanke was treasurer to pay taxes in installments, and, when sufficient deposit had been made to equal the amount of the taxes, or one-half thereof, then the county treasurer was authorized, and did, use the installments so paid to him in defraying the taxes, and a receipt would be issued to the taxpayer. There was no authority in law for the county treasurer to accept any sum less than the first or second installment. The limitations surrounding the right of a county treasurer in accepting money made it imperative for Hanke to use some depository other than an official account for such receipts. The county had no claim to this money until it had been appropriated for the payment of taxes. The money was held in trust by Hanke as a personal favor to the taxpayer. Such installments were deposited in the overremittance account, and, when a sufficient amount had been deposited so that either one-half or all the taxes could be paid, then Hanke would draw a check on the overremittance account, and appropriate the money for the purpose of paying the taxes designated to be paid by the depositor of such money. Tax installments paid into the overremittance account during this period amounted to $137,955.33.

The bulk of the taxes are paid by check. If a check is deposited in an official account and is subsequently dishonored, difficulties arise in the reconcilement of the county auditor and county treasurer's records. Hanke's practice was to draw a check on the overremittance account and make good the dishonored check in the depository bank. Later, when the dishonored check was made good by the maker, the overremittance account would be reimbursed. During this period, the reimbursement of the overremittance account for dishonored checks amounted to $523,773.11.

There were some taxpayers that Hanke had placed on the so-called "black list," and, on account of their credit standing, he would

refuse to accept their checks until the collectability had been determined, and would refuse to issue a receipt. Hanke deposited all such questionable checks in the overremittance account. In collecting checks, he acted as agent of the taxpayer. Weidler v. Arizona Power Co. (Ariz.) 7 P.(2d) 241 (Jan. 19, 1932). If and when collected, Hanke would draw a check on the overremittance account, and the official depositories would be credited with the amount of taxes so paid. Then, for the first time, the Hennepin county tax records would be credited with this payment, and a receipt for the taxes so paid would be issued to the taxpayer. During this period, questionable checks in the sum of $267,613.71 were deposited for collection in the overremittance account.

The county employees were paid twice a month. At times requests were made to the county treasurer for advances. He, however, had no authority to pay any salary in the absence of an auditor's warrant, and a system grew up whereby the employee would be paid by check from the overremittance account in contemplation of the salary warrant, and, when the salary check was issued, the overremittance account was reimbursed for the advances so made. Such reimbursements to the overremittance account amounted to $111,725.49.

It also appears that Hanke was connected with the building committee of a lodge organization that was erecting a building in the city of Minneapolis. Advances were made from time to time from the overremittance account to this organization. Subsequently, the account was reimbursed by the lodge, and such reimbursements during the period in question amounted to $52,135.31.

Apparently, other individuals outside of the employees of the county were advanced money from time to time during this period by Hanke. The evidence does not indicate the reason for such advances, but the records show that $15,046.98 was reimbursed to the overremittance account for sundry advances to, or for, various individuals. A practice was also indulged in by Hanke in exchanging checks or cash for overremittance account checks. This item amounted to $40,937.48. During the war, county employees were purchasing Liberty Bonds and War Savings Certificates on a partial payment basis. Hanke was connected in some way with this movement, and arranged for the purchase of bonds and certificates with funds from the overremittance account. When the employees made payments, the installments were deposited in the overremittance account, and reimbursement to this account was made in the sum of $19,114.02. The records also indicate that interest was received and credited to this account in the sum of $361.75. During the taxpaying period, many people preferred to pay their taxes in cash, particularly the small taxpayers, and presumably, on account of the number of people that crowd into the treasurer's office during the last few days, it was very frequent that overpayments were made in cash. Money was sometimes found in the lobby, or change was left on the counters, and all such sums or overages were credited to the over and short account and deposited in the overremittance account. These receipts amounted to $7,980.22 during this period. The other items entering into the receipts of this account during this period are as follows: Loan proceeds—$260,953.92. (This item will be subsequently commented upon.) Transfers from official accounts of Hennepin county—$17,827.77. This sum consists of three checks drawn by Hanke on the official accounts and deposited in the overremittance account shortly before his defalcations were discovered. No contention is made, however, that the defendant had any knowledge of, or participated in, this diversion. Transfers from personal accounts of Hanke—$24,513.92. This item indicates the practice of drawing money out of the overremittance account and subsequently reimbursing the account from Hanke's personal accounts. Untraced items (Hanke's books indicate that this sum was received from him)—$80,342.32. Elks Building Company and Elks Trustees—$10,258.77. (This apparently had some connection with the building project of this organization.) Unclassified—$58,591.59. Total receipts for the period in question from all sources, and including all classes of moneys, amounted to $2,107,901.31.

Early in his career as county treasurer, Hanke commenced to use the funds in the overremittance account for personal purposes. Tax deposits by realtors usually remained in the account for some time, and he would know approximately the period when the balance of the funds would be called for. Sometimes the fund in the overremittance account would be replenished with a check from his own personal account, or from other sources, but more often the depletion of the overremittance account was reimbursed and made good by the proceeds realized from so-called "irregular" loans. Hanke had sole custody of the securities of the county. In

order to raise funds, he would take securities owned by the county and deposit such securities with one or more of the three large depositories as collateral for loans. Such loans were made in the name of the county, and the notes were signed by Hanke as county treasurer. The proceeds of the loans would be deposited in the depository accounts, and transferred to the overremittance account by checks drawn on said depository accounts. Sometimes the proceeds of loans were represented by cashier's checks, but in such instances the checks were deposited directly to the overremittance account. Hanke would call for the bank statements at the depository banks personally on the first of the month, and would then destroy the checks that were used in the transfer of the proceeds of the irregular loans and the payment of irregular loans. When the loan became due, he would pay the note with a check on another depository bank, and towards the end of the month, in order to take care of the debit which appeared as the result of the payment of the loan, he would negotiate another loan with one of the other depository banks and deposit the proceeds. The securities were checked three times a year by the county board, and once a year by the public examiner, but Hanke knew when this audit would be made. When the auditors examined the accounts, he would prepare for them by having all the securities on hand for their examination. The auditors generally came around the first of the month, and, in taking care of the outstanding loans so as to procure possession of the securities, Hanke would "kite" checks through the three large depository banks so that the deficiencies in these accounts would not be discovered during the examination by the auditors. Consequently, the county securities were intact and his accounts apparently balanced.

Throughout the course of this trial, the accountants have referred to the concealed withdrawals and concealed deposits in the three large depositories as "suppressed" withdrawals and "suppressed" deposits, and such terms will be used herein. Often the suppressed deposit would be in excess of the suppressed withdrawal; that is, the amount of the loans would be increased so that there would be an overage in the account where the suppressed withdrawal had existed. Such overages would be diverted to the overremittance account. Strange as it seems, Hanke was able in the manner indicated to conceal his peculations for a period of some ten years. The total amount of suppressed withdrawals amounted to $4,605,434.99, and the amount of suppressed deposits amounted to $4,347,440.93. The large sums representing the suppressed withdrawals and suppressed deposits indicate the magnitude of Hanke's manipulations in order to cover his fraudulent transactions. Over $50,000 was paid to the depository banks as interest on the irregular loans. Apparently, the actual fruits of his circuitous diversions are fairly reflected by the amounts transferred to the overremittance account. Between 1912 and 1922, $260,953.92 in proceeds of irregular loans was deposited in the overremittance account. Most of the loans were made with use of Hennepin county collateral. However, it appears that about $98,000 of the $260,953.92 which was transferred to the overremittance account was not traceable to Hennepin county collateral. It is evident that this $98,000 was raised by Hanke from the three large depository banks, but the evidence does not indicate that he used Hennepin county collateral. In some instances, at least, it is possible that collateral other than county owned was used by Hanke.

The various classes of business that were transacted through the overremittance account, with the exception of the loan proceeds, were well known to most of the deputies in the county treasurer's office. Hanke kept a rather detailed system of books covering the overremittance account business. Monthly statements were rendered by the defendant during this entire period showing the lists of deposits and disbursements, and no county or state official ever questioned the correctness thereof. In fact, it appears that many of the Hennepin county officials were aware that an overremittance account was maintained by Hanke, and, while they were not informed as to the various classes of moneys that were deposited therein, they did understand in a general way that the account consisted of funds received under circumstances as the name itself implies; that is, over remittances and other trust funds. Usually Hanke had available funds in this account that he used for temporary advances, and, apparently, many county officials made use of this account in enabling them to procure advances on their salaries, and in carrying on some of the routine duties of their offices. For instance, the purchase of stamps was connected with some red tape because the statutes provide that, before any account against the county can be paid, a formal claim must be made in writing, and the county commissioners must approve the account before a check can be drawn on county funds. In the purchase of

stamps, it was not feasible to require the United States government to go through this routine, and, consequently, stamp money was frequently advanced from the overremittance account to various county offices, and, when the item for stamps was duly authorized to be paid, then the overremittance account would be reimbursed. Neither the county auditing board nor the public examiner of Minnesota ever sought to audit or examine this account. The county auditing board, under the law, examined the county treasurer's accounts three times a year, and the public examiner was required to make an annual examination. Various examiners of the state public examiner's office were aware that Hanke maintained an overremittance account where he deposited realtor deposits, questionable checks, etc., but no official who had authority to examine the county treasurer's accounts ever considered the overremittance account to be an official county account.

In analyzing the moneys that went into the overremittance account—assuming that irregular loan proceeds were Hennepin county moneys—it seems clear that, outside of the loan proceeds and the $17,000 odd of county money transferred in August, 1922, no county money was deposited there. The county treasurer, under the law, was not authorized to receive the classes of money that were deposited in this account, and, while this money did not belong to Hanke personally, he held it in trust, or as agent for divers persons and concerns. A county treasurer is only authorized to receive such money as he is directed by law to receive. Since 1894, a rule apparently promulgated by the public examiner's office had been in force in Hennepin county to the effect that the county treasurer was not to receive any money without written authorization from the county auditor. The tax lists were prepared by the county auditor and delivered to the county treasurer on the first Monday in January of each year, and affixed thereto was a certificate from the county auditor authorizing the county treasurer to receive the taxes so listed. This rule was at all times complied with by the county treasurer, and no funds were collected by Hanke for the county, unless due authorization in writing had been received from the county auditor; that is, it was the county auditor who determined what funds the county treasurer was permitted by law to receive. When the county auditor was in doubt as to the right of the county treasurer to receive moneys in behalf of the county, he referred the matter to the county attorney for his advice, and was governed by his interpretation of the statute. None of the moneys deposited in the overremittance account were received by the county treasurer in pursuance to any authority, written or otherwise, from the county auditor. The board of county commissioners of Hennepin county was required by law, and did, publish annual statements of the receipts and disbursements of the various departments of Hennepin county, including the office of the county treasurer. At no time during this period did the county commissioners list as funds or property of Hennepin county any of the sums deposited or credited to said overremittance account.

It is admitted that between 1914 and 1922 $83,552.52 was withdrawn by Hanke from the overremittance account and deposited in his personal account with the defendant bank. It is also uncontradicted that between 1911 and 1922 the sum of $94,601.32 was withdrawn by Hanke from the overremittance account and cleared through other banks. It is necessary to bear in mind that during the ten-year period, when the proceeds of these irregular loans were deposited in the overremittance account, this account was being used by Hanke as a bona fide overremittance depository. During this ten-year period, nearly $2,000,000 from various and sundry bona fide transactions were deposited in this account. Bona fide and legitimate withdrawals were made from the deposits of the real estate companies, the excess tax payments, the over and short account, and other withdrawals to sundry persons and concerns that were entitled to payments from that account. Furthermore, the proceeds of checks that were deposited in the overremittance account pending their collectability had to be transferred, after collected, to the regular county channels. Checks deposited in the depository accounts and returned for want of funds were made good in the official depositories with checks from the overremittance account. Advances were made to various individuals, employees, and even department heads, from the overremittance account, and subsequent reimbursements were made with checks drawn on official county depositories. Consequently, it is quite apparent that during this period a vast, heterogeneous class of business was being transacted through the overremittance account. Trust funds held by Hanke for others, and in regard to which the county had no ownership, legal or equitable, were often received by check payable to Henry C. Hanke, County Treasurer, H. C. Hanke, County

Treasurer, and various other descriptive terms were used by persons who were doing business with Hanke on account of his official position, and they did not distinguish between payments which the county treasurer was authorized and directed to accept, under the law, and remittances that were made to him personally, concerning which the county had no ownership, legal or equitable. Consequently, the fact that a large number of the checks that were deposited in and issued on this account appeared to be in the name of Henry C. Hanke, County Treasurer, or H. C. Hanke, County Treasurer, does not signify that the moneys represented by such deposits and withdrawals were Hennepin county funds.

 Plaintiff takes the position that all the funds in the overremittance account belonged to Hennepin county; that is, as between the bank and Hennepin county, it is plaintiff's contention that the designation of the account as "Over Remittance Account of Hennepin County," the style of the checks and signature cards, indisputably identifies this as a Hennepin county account, and, consequently, all the funds in that account belonged to Hennepin county. The provisions of the statutes regarding the procedure that must be followed in opening an official depository for the safe-keeping of county funds should be sufficient answer to this contention. No attempt was ever made to create the overremittance account as an official depository. The statutes specifically prohibit a deposit of county funds in any account except an official depository. Section 846, Minnesota Statutes. The fact that the account was labeled "Hennepin County Over Remittance," and the other indicia indicating that this was an official account, cannot change the ultimate fact that this was not an account of Hennepin county. It is clear that the primary purpose of this account was to enable Hanke to keep trust funds separate and distinct from his official and personal funds. The funds were not trust funds of Hennepin county. Hanke could not obligate the county by acting as trustee for others, nor could the county act as trustee. It would be ultra vires for the county to function in a fiduciary capacity. No one would seriously contend that overdrafts on this account would render the county liable. City of Pittsburg v. First National Bank, 230 Pa. 176, 79 A. 406. It is of impelling significance that no official of the county or state ever considered this account as a Hennepin county account, and to find that, merely on account of the form and style of this account,

which was maintained for Hanke's personal convenience, it should be considered a Hennepin county account, would do violence to the uncontradicted evidence as to the character of the account, and to the express provisions of the statutes. None of the trust funds in this account evolved into county funds until Hanke, with the express or implied consent of the depositor, appropriated the same to the county in payment of an indebtedness due the county. Hennepin county had no title to the real estate deposits, or to the excess tax payments, or to the deposit for Liberty loan bonds, or the other trust funds deposited in this account. The only funds deposited in the overremittance account during the entire ten-year period, save and except the three checks drawn and deposited in August, 1922, regarding which the county could have any possible claim, would be the proceeds of the irregular loans, and the fact that county money may have been diverted through this account does not make it a county account. It may be that Hanke used this style of account in order that the persons with whom he was doing business would recognize his official title and connections. He was in politics, and depended upon the votes of the people for his official position, and it is entirely possible that the form of check and the style of the account may have been prompted by his desire to connect his name with that of the treasurer's office in these personal trust transactions on account of the political prestige and advertising that might result therefrom. Hanke's personal reasons, however, in determining the name and style of an account for handling his own trust funds cannot change this account into an official depository. At any event, the form of the check used, and the name and style of the account, is not controlling, and it cannot affect the title to the various types and classes of funds that were found in this account. The substance and not the form must govern.

█ Plaintiff's complaint is based upon the theory of conversion by Hanke of county owned funds with the knowledge and consent of the defendant bank. This is an action at law and not an action in equity to trace trust funds. See Union Stock Yards Nat. Bank v. Gillespie, 137 U. S. 411, 11 S. Ct. 118, 34 L. Ed. 724. Plaintiff contends that $83,552.52 checked out by Hanke on the overremittance account and deposited in his personal account were county funds, and that a conversion took place when these funds were diverted to his personal account. It also contends that, in addition thereto,

$94,600.32 of county funds were embezzled by Hanke that were not transferred to his personal account in the defendant bank, but were cleared through other banks. It is admitted that these sums were checked out of the overremittance account by Hanke. It is, however, elementary that plaintiff must prove ownership of the funds that it alleges were converted. It also must prove that the funds were converted by Hanke and that the bank was aware of this conversion, and consented thereto and permitted the same to take place. In Clarke v. Public National Bank & Trust Co. of New York, 259 N. Y. 285, 181 N. E. 574, 575, the court stated: "Thus to establish the plaintiff's cause of action there must be proof that the original committee did not thereafter apply the funds, deposited in his individual account, 'to their proper purposes under the trust,' and that the defendant had notice or knowledge, not only that the moneys were received for a trust purpose, but also that they were diverted from that purpose. We find no such proof in this record."

Now what funds, if any, belonged to Hennepin county that were deposited in this overremittance account? Plaintiff contends that, if this account is not an account of Hennepin county, at least all the proceeds of the irregular loans belonged to Hennepin county. It must be conceded that Hanke had no authority to borrow money in behalf of Hennepin county. The use of Hennepin county bonds, and apparently the use of other bonds not traceable to Hennepin county as collateral for loans from the three large depository banks, did not result in the borrowing of county funds. The statutes of the state of Minnesota outline the manner in which a county can borrow money, and definitely describe a county's debt limitations. It was beyond the power of the county treasurer to make a loan for the county. See section 1942, Minnesota Statutes. Mitchell v. Board of Commissioners of St. Louis County, 24 Minn. 459; Grannis v. Board of Commissioners of Blue Earth County, 81 Minn. 55, 83 N. W. 495; State ex rel. Johnson v. Smith, 84 Minn. 295, 87 N. W. 775. The three large depository banks were charged with knowledge of the state law, and they knew, or should have known, that Hanke had no authority to use Hennepin county bonds in negotiating any loans. Smith v. Ayer, 101 U. S. 320, 25 L. Ed. 955; Samels v. Hartford Accident & Indemnity Co., 163 Minn. 209, 203 N. W. 620; Town of East Hartford v. American National Bank, 49 Conn. 539. Consequently, if at any time the coun-

ty had been aware that such loans were being procured by Hanke on county owned collateral, they could have demanded the return of such collateral, and the banks would have had to look to Hanke alone for the money advanced. The county did not ratify these irregular loans, and probably had no authority in law to do so. Contracts which a municipal corporation are not permitted to enter in law are not subject to ratification. Minneapolis, etc., Traction Co. v. City of Minneapolis, 124 Minn. 351, 145 N. W. 609, 50 L. R. A. (N. S.) 143; Bazille v. Board of Commissioners of Ramsey County, 71 Minn. 198, 73 N. W. 845. The suppressed withdrawals were made to take care of these loans, and such withdrawals caused a deficit in the depository accounts. In using county funds to pay his own loans, Hanke converted funds of Hennepin county. Whenever he withdrew funds from the three large depository accounts in order to pay money which he had borrowed on Hennepin county collateral, a conversion of Hennepin county funds took place. It is highly significant, however, that these conversions or shortages were paid from time to time by proceeds from irregular loans, or suppressed withdrawals from one of the three large depositories. By making good the shortage in the depository accounts, such accounts would balance. On many occasions during this period, there would be no shortage whatsoever in any of the depository accounts. Hanke had procured sufficient funds from irregular loans or other sources to pay up all shortages. Frequently, there were overages in the depository accounts for short periods of time. On or about July 29, 1922, shortly before the shortages of Hanke were discovered, it appears that by suppressed deposits, the proceeds of the irregular loans in the sum of $240,000, there came into the Northwestern National Bank an overage of $4,374.50; in the Midland National Bank, an overage of $814.06; and in the First National Bank, an overage of $882.56. If, for instance, Hanke's shortages had been discovered on that day, Hennepin county would have lost no money whatsoever. Its depository accounts were intact. In fact, there was more money in such accounts than it was entitled to. The entire loss would have fallen on the three depository banks that had permitted Hanke to procure loans by the use of Hennepin county collateral. The county could have demanded the return of this collateral under the law, and the banks would have had no alternative but to return the same, and their only recourse would have

been to proceed against Hanke personally. The overages that existed on July 29, 1922, were withdrawn by suppressed withdrawals and deposited in the overremittance account. The irregular loans, with interest, were paid on August 2, 1922. On that date, a check for $80,055.56 was drawn on the First National Bank to pay Hanke's irregular loan in that bank. A check in the same amount was drawn on the Northwestern Bank to pay an irregular loan in that bank, and a check for $80,061.11 was drawn on the Midland National Bank to pay an irregular Hanke loan at that institution. These withdrawals left a deficit in the three depository banks in the sum of $240,166.23. On August 11 and 12, 1922, checks totaling $17,827.77 were drawn by Hanke on the three large depository banks, and deposited in the overremittance account. These checks withdrew county funds, and not proceeds from irregular loans. However, the proceeds of this conversion remained in the overremittance account when Hanke's defalcation was discovered on August 12, 1922. Consequently, we have this situation with respect to the deficiencies in the three large depositories. All moneys transferred from the three official accounts to the overremittance account consisted of the proceeds of irregular loans. These loans were unauthorized by law, and the only person bound thereby was Hanke. The shortages in the depository accounts were made good from time to time during the ten-year period by suppressed deposits obtained from irregular loans. There was a series of embezzlements from the three official depositories which were restored or made good on some thirty-nine different occasions. On July 29, 1922, there was no shortage in any of the Hennepin county depositories. It was then that the three checks, totaling a sum in excess of $240,000, were drawn by Hanke on the official depositories to pay his irregular loans contracted with these banks. Payment of Hanke's loans with Hennepin county funds was clearly unauthorized and illegal. The action of the banks in honoring checks drawn on themselves to pay Hanke's irregular loans, which only created an obligation from Hanke to themselves, was unlawful. The actual deficiency, therefore, existing in the three large depositories when Hanke's fraud was discovered resulted from the acts of the depository banks in honoring Hanke's checks drawn on county funds to pay his irregular loans. It was this shortage caused by these checks that was made good by the plaintiff company when it paid to Hennepin county the sum of $249,245.93.

There was no shortage at this time in the overremittance account. In fact, there was an overage in this account when Hanke's defalcations were discovered. Generally, there is no liability or right to claim money misappropriated when it appears that the shortage occasioned by the misappropriation has been restored. The owner of the original funds becomes a purchaser for value of the restored moneys. The following cases tend to sustain this view: Pope v. Ramsey County State Bank, 137 Minn. 46, 162 N. W. 1051; London Banking Company v. River Plate Bank, 21 Q. B. D. 535; Taylor v. Blakelock, 32 Ch. Div. 560; Anderson v. Walker, 93 Tex. 119, 53 S. W. 821; Ingraham v. President, etc., of Maine Bank, 13 Mass. 208.

It is admitted that, of the so-called irregular loan proceeds, approximately $119,168.47 was transferred from the depository accounts to the overremittance account, and approximately $141,785.45, the proceeds of irregular loans, was received by Hanke in the form of cashier's checks, and deposited in the overremittance account. Plaintiff contends that, regardless of the initial ownership of the funds procured by irregular loans, when such funds were deposited in the regular depository accounts, such moneys became county funds by virtue of section 852 of the Minnesota Statutes. This section provides that "all amounts found at any time in any of the county treasuries of the state, or officially deposited by the county treasurers, shall be deemed public funds, and, if in excess of the amount properly called for by the * * * treasurer's books and accounts, shall be turned over by the board of auditors or by the public examiner to the county revenue fund." By virtue of this statute, plaintiff contends that, at least to the extent that the proceeds of irregular loans were deposited in the regular depository accounts, such moneys then became county owned moneys, and, when diverted to the overremittance account, Hennepin county still retained title. The court is extremely doubtful that a Legislature can determine ownership by statutory regulation contrary to the proven facts. The purpose of the statute in question is to insure the separation of public and private funds, and to safeguard the county funds from being confused with any other moneys. The penalty held out by this statute is a forfeiture to the county of any excess funds found in a regular depository. At the time Hanke's defalcations were discovered, no moneys were found in the depositories in excess of

county funds. It seems to the court that this statute simply raises a presumption of ownership, which presumption can be overcome by proof as to the real owner of such funds. For instance, if Hanke accepted a deposit from a real estate concern to protect its taxes, and proceeded to place such funds in an official depository, it would hardly seem just that the true owner of such funds should not be permitted to obtain restitution. However, in view of the court's findings in this case, it does not become necessary to decide the ownership of the proceeds of the irregular loans, nor the effect of Hanke's covering the shortages in the depository accounts by suppressed deposits obtained from irregular loans so that no shortage existed in the three large depository accounts, except that which was occasioned by the three checks honored by the depository banks in paying Hanke's irregular loans. Not only does it clearly appear that the overremittance account was not a county account, but plaintiff has entirely failed to prove that Hanke, in checking out funds of the overremittance account, converted county owned money. Assuming that the proceeds of the irregular loans belonged to Hennepin county, and even assuming that some of the other funds in the overremittance account were county moneys, it is undisputed that nearly $2,000,000 of other classes of money were received in the overremittance account during this period, the large bulk of which were not county funds. The mere fact that Hanke drew checks on the overremittance account, and deposited such checks on his personal account, would not prove that Hennepin county funds were diverted.

"A fiduciary may legally deposit the trust funds in a bank to his individual account and credit. Knowledge on the part of the bank of the nature of the funds received and credited does not affect the character of the act. The bank has the right to presume that the fiduciary will apply the funds to their proper purposes under the trust. * * * Trust funds do not lose their character as such by being deposited in a bank for the individual credit and account of the person who is trustee. * * * A bank does not become privy to a misappropriation by merely paying or honoring the checks of a depositor drawn upon his individual account in which there are, in the knowledge of the bank, credits created by deposits of trust funds. The law does not require the bank, under such facts, to assume the hazard of correctly reading in each check the purpose of the drawer, or, being ignorant of the purpose, to dishonor the check. The presumption is, and after the deposits are made remains until annulled by adequate notice or knowledge, that the depositor would preserve or lawfully apply the trust funds." Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, 760, L. R. A. 1916F, 1059.

In Maryland Casualty Co. v. City National Bank (C. C. A.) 29 F.(2d) 662, 663, the court stated: " * * * The better reasoned cases hold that, in the absence of a statute making it so, the drawing of a check in due form upon a trust fund and the depositing of it in the same bank to the personal credit of the trustee is neither a conversion or misappropriation of the fund nor notice to the bank of any such purpose. Under these authorities it cannot be held that the bank aided in the misappropriation by merely accepting for deposit in the personal account checks drawn on the trustee account."

The following cases were cited: Driesbach v. Second National Bank, 104 U. S. 54, 26 L. Ed. 658; City of Helena v. First National Bank, 173 Ark. 197, 292 S. W. 140; Havana Central R. Co. v. Central Trust Co. (C. C. A. 2) 204 F. 546, L. R. A. 1915B, 715; Southern Trust & Commerce Bank v. San Diego Savings Bank, 60 Cal. App. 215, 212 P. 385; Goodwin's Adm'r v. American National Bank, 48 Conn. 550; Allen v. Fourth National Bank, 224 Mass. 239, 112 N. E. 650; Kendall v. Fidelity Trust Co., 230 Mass. 238, 119 N. E. 861; Munnerlyn, Trustee, v. Augusta Savings Bank, 88 Ga. 333, 14 S. E. 554, 30 Am. St. Rep. 159; Whiting v. Hudson Trust Co., 234 N. Y. 394, 138 N. E. 33, 25 A. L. R. 1470.

The Supreme Court of Minnesota has adopted the same rule in Rodgers v. Bankers' National Bank, 179 Minn. 197, 229 N. W. 90. The court stated on page 204 of 179 Minn., 229 N. W. 90, 92: "We cannot agree to the contention that when one deposits funds in his personal bank account it must be regarded as equivalent to a declaration of intent to devote them to his personal ends. * * * Up to this point no conversion has been facilitated."

The case of Empire Trust Company v. Cahan, 274 U. S. 473, 47 S. Ct. 661, 71 L. Ed. 1158, 57 A. L. R. 921, is in accord.

Plaintiff has utterly failed to sustain the burden imposed upon it in establishing notice to the bank of the diversion of county funds to Hanke's personal use, or to the use of third persons. The complicated and circuitous transfers of checks between the overremittance account to Hanke's private

account, and between the overremittance account and the depository banks — together with the other multitudinous withdrawals and restorations that Hanke indulged in — from the very nature thereof could not cast any knowledge upon the defendant bank with respect to the overremittance account being used for the diversion of the proceeds of irregular loans, or actual county funds. It is undisputed that large sums of money from Hanke's personal account were deposited in the overremittance account, and it appears that the sum of $4,628.65 was transferred to the three official depositories from Hanke's personal account. The defendant bank knew the requirements of the statutes with respect to an official depository. It knew that the overremittance account was never qualified as an official depository. It had the right to assume that Hanke was obeying the law and was not using an unofficial account for the deposit of county money. It had no reason to suspect, and did not know, that any actual county funds were deposited in the overremittance account. No official during this entire period ever checked or audited the deposits and disbursements. Checks payable to Henry Hanke, county treasurer, were cleared frequently in carrying out the legitimate purposes of Hanke's trust. Some checks were deposited in Hanke's personal account, and others cleared through various local banks. In view of all the circumstances, no presumption of any wrongdoing on Hanke's part would arise merely because funds from the overremittance account were transferred to various other depositories. If it is clearly borne in mind that the overremittance account was not an official account of Hennepin county, it must be manifest that a bank in a large community cannot be required to scrutinize and examine the various transactions of a public official who is apparently handling trust funds for various classes of persons and concerns. Particularly is this true when the account is not a mere subterfuge, but is carried on and maintained primarily for a legitimate purpose. The defendant bank should not be required to exhibit greater care and circumspection than the various public officials and public examiners, whose duty it was to investigate and audit the accounts of the county treasurer. The language in Whiting v. Hudson Trust Company, supra, on page 406 of 234 N. Y., 138 N. E. 33, 37, is pertinent: "The transactions of banking in a great financial center are not to be clogged, and their pace slackened, by overburdensome restrictions." This statement was cited with approval in Empire Trust Co. v. Cahan, supra.

It seems clear that the defendant bank was justified in assuming that Hanke was acting with due authority in his disbursement of the funds in the overremittance account. The defendant discharged its obligation when it received the deposits and paid out the money on the checks that were drawn by Hanke. True, the bank had reason to believe that the bulk of the moneys in the account were trust funds. The name itself indicated that some of the funds consisted of overremittances that were made to Hanke in his official capacity; but to charge the defendant with notice that Hanke was misappropriating such trust funds would impose a duty upon the defendant of exercising the intuition of a financial wizard, in view of the maze of transactions that passed through the various accounts with which Hanke was in some way connected. There is no sufficient proof that would charge the bank with knowledge that Hanke was misappropriating county funds. Nor does there appear in the evidence any peculiar facts or circumstances that should have put the bank on its guard, which the court commented upon in the cases of Fidelity & Deposit Co. of Maryland v. Farmers' Bank (C. C. A.) 44 F.(2d) 11, and Fidelity & Deposit Co. of Maryland v. People's Bank (C. C. A.) 44 F.(2d) 19. These cases were not concerned with withdrawals from an account where there were mixed trust funds.

It might be observed that, even though this were an action to trace trust funds, plaintiff has failed to produce any proof, according to the well-recognized rule of "first in, first out," that it was funds of Hennepin county that found their way into Hanke's personal account from the overremittance account, and not moneys belonging to other beneficiaries. Unquestionably, the deposits in the overremittance account consisted of funds belonging to various beneficiaries. We have a confusion of trust funds. If plaintiff contends that it has a right to trace trust funds in this action, it must prove that it was Hennepin county funds that were diverted to Hanke's personal account. In Clayton's Case, 1 Meriv. 572; In re Hallet's Estate, 13 Ch. Div. 696; In re Stenning, 2 Ch. 433; Hewitt v. Hayes, 205 Mass. 256, 91 N. E. 332, 137 Am. St. Rep. 448; In re Mulligan (D. C.) 116 F. 715; In re Bolognesi & Co. (C. C. A.) 254 F. 770; Empire State Surety

Co. v. Carroll County (C. C. A.) 194 F. 593; Cunningham v. Brown, 265 U. S. 1, 44 S. Ct. 424, 68 L. Ed. 873.

In the last analysis, the case might well be disposed of by a finding that, so far as the defendant bank is concerned, the inference of legitimacy of the various withdrawals from, and deposits in, the overremittance account during this entire period is just as consistent with the evidence as an inference that Hanke was diverting and misappropriating funds of Hennepin county by such deposits and withdrawals. The defendant is entitled to the benefit of this inference.

The court is clear that plaintiff has failed to establish any liability on the part of the defendant for the shortages of Henry C. Hanke.

The court adopts the foregoing as its findings of fact, and makes the following declarations of law:

(1) That it has jurisdiction to hear and determine this action.

(2) That plaintiff take nothing by its cause of action herein, and that the same be dismissed, and defendant have judgment for its costs and disbursements herein.

Let judgment be entered accordingly.